STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF GUILFORD          CIVIL ACTION NO: 14 CVS 6156

NEW BREED, INC.,

    Plaintiff,

v.

JAY S. FORD,

    Defendant.

**COMPLAINT AND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff alleges as follows:

## OVERVIEW

1. This action arises from Defendant's violation of a noncompetition covenant set forth in his employment agreement with Plaintiff through his engagement by Plaintiff's direct competitor, Ingram Micro Inc. and/or its affiliates ("Ingram").

2. Plaintiff NEW BREED, INC. (together with its affiliates and subsidiaries, "New Breed") is a global third-party logistics services provider. Its business includes the design, implementation, and operation of comprehensive supply chain solutions, including reverse logistics support, for industry leaders, ranging from the technology industry to the aerospace and defense industry. New Breed's customers include, among others, Verizon, Nokia, Avaya, and Boeing.

3. During his employment with New Breed, Defendant Ford worked in upper management positions at its Fort Worth, Texas facility. Initially New Breed's Director, Operations Support, Ford was promoted to Executive Director of Operations last fall. In his

1

employment agreement with New Breed, Ford promised for a period of twenty-six (26) weeks after the termination of his employment not to become employed by a "Competitor," including any "logistics company," "third party logistics company," or "lead logistics company."

4. In violation of his contractual duties to New Breed, Ford has accepted employment with Ingram, a New Breed competitor that also provides logistics services to the wireless communication and technology industries.

5. Ford's breach of his noncompetition covenant is causing, and will continue to cause, irreparable harm to New Breed in a manner that cannot be fully and adequately compensated by monetary damages. Accordingly, in addition to monetary damages, New Breed seeks a temporary restraining order and preliminary and permanent injunctive relief.

## PARTIES AND JURISDICTION

6. Plaintiff NEW BREED, INC. is a North Carolina corporation headquartered in High Point, North Carolina. New Breed designs, implements, and operates comprehensive supply chain solutions, including reverse logistics support, for the technology industry as well as other industry leaders and government/defense agencies.

7. Upon information and belief, Defendant Ford is a resident of Fort Worth, Texas. As described in more detail below, he served in various high-level positions at New Breed's Fort Worth, Texas facility until his resignation, effective May 16, 2014.

8. While employed at New Breed, Ford attended meetings and training at New Breed's headquarters in High Point, North Carolina and communicated with personnel in High Point on a weekly basis.

## FORD'S EMPLOYMENT WITH NEW BREED

9.  In connection with his hiring as Director, Operations Support, Ford entered into an Employment, Confidentiality and Non-Compete Agreement with New Breed on or around July 20, 2010. In connection with his promotion to Executive Director of Operations, Ford executed an Employment, Confidentiality and Non-Compete Agreement with New Breed and its affiliates and subsidiaries dated October 21, 2013 (the "Employment Agreement"), which is attached to this Complaint as Exhibit 1.

10. The Employment Agreement provides, in pertinent part, that so long as he is employed by New Breed and for a period of 26 weeks after termination of his employment, Ford would not become employed with a "Competitor," which includes any entity "operating as a logistics company ... third party logistics company or lead logistics company including but not limited to being engaged in the business of transportation and transportation solutions warehousing warehouse and inventory control delivery and product management supply chain management procurement services and network and technology-based transportation and inventory management solutions and outsourcing repair operations including but not limited to wireless telephone distribution and repair services wireless repair and refurbishment and including but not limited to the following entities ... [including] Brightpoint."

11. In the Employment Agreement, Ford also agreed to act as a fiduciary to New Breed and to maintain the confidentiality of New Breed's information. As such, he promised not to disclose or to use New Breed's confidential information for his own or any other entity's benefit without New Breed's prior written consent.

12. In addition, Ford agreed that the breach or anticipated breach of the Employment Agreement "will cause irreparable and permanent injury to" New Breed and that, in such event, New Breed is entitled to injunctive relief "without the necessity of posting bond."

13. Ford began his employment with New Breed as Director, Operations Support at New Breed's Fort Worth facility. In this capacity, Ford was responsible for New Breed's direct fulfillment operations in Fort Worth, which involves receiving, inspecting, kitting, and shipping repaired devices to consumers. His duties included overseeing operations and processes, managing between 400 and 700 employees, ensuring the smooth daily distribution of thousands of products to consumers, and liaising with New Breed's customers.

14. As Executive Director of Operations, Ford ran a highly complex logistics operation. In this role, Ford was responsible for New Breed's reverse logistics testing center, including managing 900 employees, overseeing the testing, grading, and evaluation of equipment, ensuring appropriate quality and program management, and coordinating with New Breed's customers to ensure that their objectives were being satisfied.

15. As Director, Operations Support and as Executive Director of Operations, Ford participated in weekly meetings with New Breed leaders who discussed confidential and proprietary information relating to the business of the company, including the development or refinement of operational methods and processes, the productivity and efficiency of facilities, and the comparative tactical status of the facility to other New Breed operations.

16. Through his employment, Ford became privy to New Breed's confidential and proprietary information, including the methods, processes, and equipment that New Breed employs to increase efficiency and reduce costs in its logistics services, including its wireless communication repair, refurbishment, and distribution services. For example, Ford was

4

intimately familiar with the proprietary information systems that New Breed has developed to enable it to provide unique value-added logistics services to its wireless communication customers through the capture and utilization of device and model failure data. In addition, he had extensive knowledge regarding the way New Breed leverages this information in designing its infrastructure and workflow requirements to reduce costs and increase efficiencies. Similarly, Ford obtained sensitive, competitively valuable information regarding New Breed's unique, proprietary packaging and distribution process for its forward logistics operation.

17. Moreover, as a key New Breed employee, Ford attended the annual New Breed Business Summit for upper level management. Through these Summits, Ford was privy to information on the business, strategies, and objectives of all facets of New Breed's operations, including, *inter alia*, its Aerospace, Government, and Commercial divisions. Through these Summits and otherwise, Ford obtained information on budgeting and operational plans of New Breed's forward and reverse logistics wireless communication divisions.

18. Ford also participated in preparing business proposals for New Breed customers, including Nokia and Verizon. Furthermore, Ford ran two new repair projects for Nokia and Verizon during his final year at New Breed. In conjunction with these proposals and projects and his other responsibilities at New Breed, Ford obtained sensitive confidential information regarding Nokia and Verizon's business objectives and requirements.

19. In addition, Ford had extensive interactions with New Breed customers. For instance, for many years Ford interacted on a daily basis with Verizon and participated in quarterly business review meetings at Verizon's New Jersey headquarters.

5

## FORD'S BREACH OF THE NONCOMPETITION COVENANT

20. Ingram business includes acting as a "global third-party logistics (3PL) provider delivering the world's most scalable fulfillment solutions to a wide range of industry and product leaders." ABOUT IML, http://corp.ingrammicro.com/Partner-with-Us/Products-and-Services/Logistics.aspx (last visited May 21, 2014).

21. In recent years, Ingram has expanded its logistics services. For example, according to its 2013 10-K, "[i]n 2012, [Ingram] made major strides in expanding our presence in areas of strategic focus through the following acquisitions: Brightpoint, Inc. ("BrightPoint"), the global leader in mobile device lifecycle services[.]" In addition, "[d]uring 2013, [Ingram] completed acquisitions that strengthen our capabilities in supply-chain services and cloud-based solutions." More specifically, Ingram expanded its "supply-chain services with the acquisition of two logistics service providers" in 2013. Furthermore, Ingram has recently opened a mobile device repair facility in Costa Rica that "primarily serves Ingram Micro Mobility's partnership with a major U.S. mobile carrier, creating added capacity and efficiencies to support smartphone recovery operations," and entered a strategic source and integrated supply chain services agreement with a consortium of four of Verizon Wireless's largest national dealers.

22. Ingram, like New Breed, provides 3PL and reverse logistics support to a variety of industries, including the technology and mobility industry. This support includes supply chain analysis and design; warehousing and warehouse management; order-management and fulfillment solutions; demand planning; receiving; storage; and return processes through which products are repaired, recycled, and refurbished for resale.

23. Ingram and New Breed compete in providing logistics services, particularly to the technology industry. For instance, both New Breed and Ingram operate wireless repair and

6

refurbishment systems, through which they process, repair, and coordinate the return and overhaul of cellphone equipment. Upon information and belief, both Ingram and New Breed conduct these operations through facilities in the Fort Worth area. Moreover, Brightpoint — which Ingram acquired in 2012 — is specifically named as a "Competitor" in Ford's Employment Agreement. And Brightpoint, in its SEC filings, identifies New Breed as a competitor, both with respect to logistics and refurbish and repair services.

24. On April 9, 2014, Ingram offered Ford the position of Vice President, Reverse Logistics and Repair. In response, Ford told New Breed that he was leaving for Ingram.

25. After New Breed pointed out to Ford that this position blatantly violated his noncompetition obligations and offered Ford a substantial raise, Ford agreed to stay at New Breed as its Executive Director of Operations.

26. Thereafter, Ingram offered Ford the role of Executive Director of Business Processes, an ill-defined position that it created specifically for Ford.

27. Ford accepted this position at Ingram. When discussing his new employment with his New Breed coworkers, Ford claimed that he was going to be working on mergers and acquisitions for Ingram, which he posited would not violate his noncompetition agreement. Ford's description of his anticipated job responsibilities does not match Ingram's description of his position.

28. Upon learning of Ford's employment with Ingram, New Breed sent a letter to Ford reminding him of his noncompetition obligations and warning him that his employment with Ingram violated these obligations. This letter is attached (without enclosures) as <u>Exhibit 2</u>.

29. In response to this letter, Ingram's lawyer sent a letter dated May 15, 2014 to New Breed. In this letter, Ingram maintained that

7

Case 1:14-cv-00456-TDS-LPA   Document 2   Filed 06/04/14   Page 7 of 11

Ford will be responsible for reviewing and developing Ingram Micro's business processes, excluding any repair processes. He will also be responsible for identifying opportunities for continuous improvement and optimization of Ingram Micro's Mobility Unit, as well as extending those best practices to new acquisitions, in addition to emerging markets, focused initially on Ingram Micro's expansion plans in Canada and Latin America.

This vague job description failed to alleviate New Breed's concerns that Ford, whose entire expertise and background is in logistics, cannot feasibly be employed by Ingram — a global logistics company — in any capacity that complies with Ford's noncompetition obligations. That Ingram's Canadian and Latin America facilities engage in wireless communication logistics, including repair and refurbishment of equipment, further confirms that even Ford's reconfigured activities will violate his noncompetition obligations.

30. For the past few weeks, New Breed has attempted to resolve its concerns regarding Ford's role through dialogue with Ingram. To date, Ingram has failed to provide meaningful clarity on how Ford's new position — in which he will be reporting to the same individual, Ingram Micro Mobility North America President Bashar Nejdawi, as he would have in the role of Vice President, Reverse Logistics and Repair — would comply with Ford's noncompetition obligations.

31. Ingram is a "Competitor" of New Breed, as defined in the Employment Agreement. Ford has not and cannot establish that he will be providing services for Ingram or will work in an area, segment, or division of Ingram that does not compete in any way with New Breed.

32. Ford is currently in breach of his noncompetition obligations by virtue of his employment with Ingram. Accordingly, to prevent continued irreparable harm from Ford's violation of his noncompetition covenant, New Breed has been compelled to file this lawsuit.

8

33.  As a direct, proximate, and foreseeable result of Ford's violation of his Employment Agreement, New Breed has been damaged and has incurred additional expenses and damages.

## COUNT I
### BREACH OF CONTRACT AND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION

34.  The allegations of the preceding paragraphs of this Complaint are incorporated by reference and realleged as if fully set forth herein.

35.  The Employment Agreement is a valid, binding, and enforceable contract between Ford and New Breed.

36.  The noncompetition covenant with Ford is written, was entered into as part of a contract for employment, and is based upon reasonable consideration.

37.  As consideration for the Employment Agreement, New Breed agreed to provide, and did provide, Ford with confidential and proprietary information of New Breed.

38.  Ford's noncompetition covenant with New Breed protects New Breed's legitimate and important interests, including New Breed's confidential information and trade secrets and its business and competitive interests in the marketplace.

39.  Ford has breached the Employment Agreement by working or threatening to work for a Competitor in violation of the Employment Agreement.

40.  Ford's breach is directly and proximately damaging New Breed.

41.  Pursuant to North Carolina Rule of Civil Procedure 65, New Breed moves this Court for a temporary restraining order and preliminary injunctive relief prohibiting Ford from violating his noncompetition covenant. Unless so enjoined, Ford's breach of the noncompetition covenant will cause irreparable harm to New Breed and will cause injuries that cannot be adequately compensated by monetary damages. Unless enjoined, the injury to New Breed is

immediate and pressing, and a temporary restraining order and preliminary injunctive relief are necessary to preserve the status quo, to protect New Breed's rights, and to prevent injury to New Breed pending the trial of this action. New Breed is likely to succeed on the merits.

42. In addition, as a result of Ford's breach of the Employment Agreement, New Breed is entitled to recover its damages in an amount to be proven at trial and to permanent injunctive relief fully enforcing the noncompetition covenant for 26 weeks.

## PRAYER FOR RELIEF

**WHEREFORE**, New Breed prays that this Court:

A. Enter judgment against Ford for compensatory damages proximately resulting from his unlawful conduct in an amount to be determined at trial;

B. Grant New Breed a temporary restraining order and preliminary and permanent injunctive relief prohibiting Ford, for a period of 26 weeks, from violating the noncompetition covenant in his Employment Agreement;

C. Tax all costs of this action to Ford; and

D. Award New Breed any such other relief as may be just and proper.

This 2nd day of June, 2014.

                                      /s/ Sinéad O'Doherty
                                      David C. Wright, III
                                      N.C. State Bar No. 11161
                                      Douglas M. Jarrell
                                      N.C. State Bar No. 21138
                                      Sinéad N. O'Doherty
                                      N.C. State Bar No. 38402

                                      ROBINSON, BRADSHAW & HINSON, P.A.
                                      101 North Tryon Street, Suite 1900
                                      Charlotte, North Carolina 28246-1900
                                      Telephone: (704) 377-2536
                                      Facsimile: (704) 378-4000

                                      *Attorneys for Plaintiff*